THE BROWN BAG FILLING MACHINE COMPANY *vs.* THE UNITED SMELTING AND ALUMINUM COMPANY.

Third Judicial District, New Haven, January Term, 1919.
PRENTICE, C. J., RORABACK, WHEELER, BEACH and GAGER, Js.

In an action to recover damages for the defendant's refusal to take and pay for 34,000 pounds of "aluminum rod" alleged to have been purchased by it of the plaintiff, the principal issue between the parties was whether the contract, which was evidenced mainly by telegrams and letters, called for rods of pure aluminum, as contended by the defendant, or whether rods containing 86 per cent of that metal answered the description. The plaintiff also sought to recover, under a second count, for 1,490 pounds of ½ inch aluminum rods and two 25-pound coils which it had sold and delivered to the defendant, and which the latter admittedly had not returned, though it denied having accepted them. The plaintiff had a verdict under each count and the defendant appealed. *Held:—*

1. That no error was committed by the trial court in the preliminary portion of its charge setting forth the substance of the pleadings and of the defendant's written order and the plaintiff's acceptance.

2. That the intimation in the charge that the contract, "whatever it was," was completed by letters of a certain date, was justified by the exhibits and the allegations of the defendant's answer.

3. That an instruction authorizing the jury to take into account the experience, or lack of experience, of the respective parties in the aluminum trade, in determining the meaning of the words "rod aluminum" in the contract, was erroneous and quite possibly prejudicial to the defendant, who was a regular dealer in that metal, while the plaintiff was not.

The aluminum rods ordered by the defendant were "to be drawn to our [its] specifications"; and the trial court instructed the jury that it was for them to determine whether that expression had any distinct, well-known meaning in the trade, and whether it referred to the composition as well as to the size of the rod; and that if it had such double reference, it was for them to decide "whether the plaintiff knew, or in the exercise of reasonable care and intelligence ought to have known, that the words were used in such special sense." *Held* that this instruction was quite foreign to the real issue, which was merely whether rod aluminum meant pure aluminum; and that the knowledge or ignorance of the plaintiff of any special meaning attached to the expression quoted—if

93 Conn.            JULY, 1919.            671

Brown Bag Filling Machine Co. *v.* United Smelting & Aluminum Co.

such a meaning were found,—would not be a factor in the interpretation of the contract, as the instruction seemed to imply.

A retention of possession by the vendee without making any objection to the quality of the goods for an unreasonable period, is a sufficient basis for a finding that he had accepted them.

While the acquiescence of one party in the construction placed upon an ambiguous contract by the other, may be entitled to great weight under certain circumstances, this rule or principle has no application to mere self-serving declarations in correspondence between the parties, wherein each side persists in its own interpretation of a technical trade term used in the written agreement; and therefore an instruction which authorizes the jury to take such letters into consideration, in passing upon the meaning of the trade expression, is erroneous.

The vendee's acceptance of one instalment of merchandise which substantially conforms to the contract, will not preclude him from declining to accept other instalments which in fact do not conform to it, although there was but one contract for the entire lot.

Argued January 24th—decided July 31st, 1919.

ACTION to recover damages for the alleged wrongful refusal of the defendant to accept delivery of aluminum rods purchased by it of the plaintiff, with a count for other rods sold and delivered, brought to the Superior Court in New Haven County and tried to the jury before *Tuttle, J.;* verdict and judgment for the plaintiff for $5,655, from which the defendant appealed. *Error and cause remanded.*

In February, 1916, the plaintiff, in Fitchburg, had on hand about 34,000 pounds of aluminum rods of various sizes, and had the right, by contract, to about 4,400 pounds of aluminum not drawn and to be specified. The plaintiff was not a dealer in aluminum, but had this quantity of aluminum on hand as the result of its failure to place a contract requiring its use. It was admitted upon the pleadings that about February 18th, 1916, the parties, as a result of written negotiations, entered into a written contract by which the defendant agreed to buy of the plaintiff and the plaintiff agreed to sell to the defendant 34,078 pounds

of aluminum rods at 80 cents per pound, to be drawn to sizes to be specified by the purchaser. It was also admitted that a lot consisting of 1,490 pounds of this aluminum was delivered to and received by the defendant which did not need to be changed in size. The action is to recover damages for the refusal of the defendant to take and pay for the remainder of the aluminum rod described in the contract.

The defense is that the aluminum rod of the plaintiff was not pure aluminum, and there is a counterclaim for damages caused the defendant by the plaintiff's failure to deliver pure aluminum; and the substantial controversy was over the question whether the contract called for pure aluminum or the aluminum rods of commerce as understood in the aluminum trade, and whether, by acceptance of part of the aluminum rods, the defendant in law accepted the whole.

In the second count the plaintiff sought to recover the price of certain aluminum rods, and coils of aluminum wire, delivered to and received by the defendant as for goods sold and delivered.

The plaintiff offered evidence to prove and claimed to have proved a telegram from the defendant to the plaintiff February 12th, 1916, as follows: "Understand you have quantity rod aluminum to offer. Wire size and quantity lowest rock bottom price delivered New Haven." The plaintiff wired back that same date: "Spot aluminum rods twenty six thousand pounds inch quarter six thousand nine sixteenths fifteen hundred half inch seven hundred decimal one one eight forty four hundred to specify price eighty cents Fitchburg." The plaintiff confirmed this telegram by letter giving greater detail, but the receipt of this letter was in dispute.

The item 4,400 pounds became the subject of a separate contract known as No. 1414 or the Philadelphia order, as to which no question arises here.

The plaintiff also offered evidence to prove that after written negotiations the defendant, on February 18th, 1916, placed with the plaintiff order No. 1438 for aluminum rods as follows:—

"New Haven, Connecticut, Feb. 18, 1916.
To Brown Bag Filling Machine Co.
Fitchburg, Mass.

Please furnish this Company with the material specified below, subject to conditions printed hereon and ship via . to New Haven, Conn.

Render duplicate invoice without price. No allowance for packages or cartage.

All goods subject to inspection—if not found in accordance with purchase will be rejected and must be replaced with goods as ordered immediately.

| Quantity | | Material | Price |
|---|---|---|---|
| 26,000# | 1¼″ | Rod Aluminum | 80c. per pound |
| 6,000# | 9/16″ | " | drawn to our |
| 1,500# | ½″ | " | specifications |
| 700# | .118 | " | |

to be drawn to our specifications

Terms net cash F. O. B. New Haven Delvy. 2 weeks.
United Smelting & Aluminum Company,
by L. Lapides."

This order was confirmed by accompanying letter, and the order was duly acknowledged and accepted by the plaintiff.

The plaintiff further claimed to have proved that under the agreement the defendant instructed the plaintiff to send to New Haven immediately the 1,490 pounds of one-half inch wire rod, and to send to a factory at Massena, the balance of the order, the defendant agreeing to furnish definite instructions before they should reach Massena as to the sizes to which the rods

were to be drawn; and that the plaintiff did ship the 1,490 pounds to the defendant at New Haven which was accepted by the defendant without any reduction in size and without any objection of any sort, but that no part of the same was ever paid for.

The plaintiff shipped to the mill at Massena the remaining aluminum rods, giving due notice to the defendant of their arrival. The 1,490 pounds of one-half inch aluminum rods were part of the entire purchase covered by the defendant's order 1438. The plaintiff also claimed to have proved that upon order by the defendant the plaintiff sent to it at New Haven two sample coils of twenty-five pounds each of rods sent to Massena drawn to thirty-five seconds of an inch in diameter, which were received by the defendant and accepted and never paid for; that the plaintiff repeatedly asked the defendant for instructions as to the sizes to which the rods shipped to Massena should be drawn, and that the defendant never sent the same and refused to pay for the aluminum ordered, or any part thereof; that the term "aluminum rods" as used in the trade and as used and understood by the parties in making this contract, meant rods composed partly of pure aluminum metal and partly of different alloys, and did not mean, as claimed by the defendant, rods made of aluminum 98 to 99 per cent pure; that the goods in fact sold by the plaintiff were a specific lot of rods then in the plaintiff's warehouse, and that they were aluminum rods as the term is understood in the aluminum trade and as it was used and understood by the parties when they made the contract; that the term "aluminum rod" as used in the aluminum trade meant a rod containing anywhere from 85 per cent to 95 per cent pure aluminum, with the balance of alloys used for hardening purposes; that the plaintiff knew that the aluminum rods sold by it to the defendant

were an alloy and not pure aluminum, but did not know that said rods contained about 86½ per cent of pure aluminum until some time after the contract was made.

The defendant, admitting the negotiations and the contract evidenced by order No. 1438, as appears by the pleadings and its statement of claims, offered evidence to prove and claimed to have proved that the 1,490 pounds of one-half inch aluminum rods were delivered to it and by it sold to a purchaser in Chicago, without examination, as pure aluminum, and that two months later it received word from its purchaser that it was not pure aluminum, but contained only 93 per cent of aluminum, but the defendant offered no evidence as to the amount of its adjustment with its Chicago purchaser; that on March 15th, 1916, the plaintiff advised the defendant by telephone that it had received information from the Boston office of the Aluminum Company of America that alloy of the aluminum rods then at Massena was such that wire drawn from it to the size specified would not be satisfactory, this conversation being confirmed by letter; that the defendant, upon the receipt of such information, refused to accept the wire or rods, because such rod or the wire to be drawn therefrom was not of the character of rod or wire that defendant purchased; that by all the correspondence, which were exhibits in the case, it appeared that the plaintiff sold the defendant pure aluminum, known in the trade as "2 S.," and that defendant purchased such quality aluminum and not an alloy, and that the real contract should be ascertained from the conduct of the parties and the entire correspondence.

It appeared, also, that the rods sold to the defendant were what is known in the aluminum trade as 15 S. or 15 S. H. and not 2 S., which is the symbol for pure aluminum.

It also appeared from the finding that before the

case went to the jury counsel for both sides, at the suggestion of the court, agreed that the plaintiff would claim damages based on a market value of 50 cents per pound for the rods the defendant refused to take; and that the defendant, under its counterclaim, would claim damages based on a value of $1.12½ per pound for pure aluminum which it claimed it had agreed to buy and which the plaintiff had not delivered; and the jury were informed of this agreement.

All of the correspondence was made part of the finding, together with the testimony in the case. It is impracticable to set out the correspondence in full. It is sufficient to say that from this it appears that in the original inquiry, and in all letters and telegrams prior to and including the closing of the contract, the material was referred to as "aluminum rod" or "rod aluminum," and when aluminum alone is mentioned, the context shows that aluminum rod is meant.

The size of wire and use to which it was to be put first appeared in a letter of March 7th, 1916, from defendant to plaintiff, and nothing appears in the written negotiations and contract which in any way serves to define the term "rod aluminum," or to indicate the use to which it was to be put other than the statement, "to be drawn to our specifications." Such other facts as are necessary for an understanding of the opinion are sufficiently stated in the opinion itself. The jury found for the plaintiff and the defendant appealed.

*Benjamin Slade* and *Harry L. Edlin,* for the appellant (defendant).

*Thomas M. Steele* and *Eliot Watrous,* for the appellee (plaintiff).

GAGER, J. Between February 18th and February 22d, 1916, the plaintiff and the defendant, after negotia-

tions in writing, entered into a written contract of sale under which the plaintiff sold to the defendant about 34,000 pounds of aluminum rod. The plaintiff was not a dealer in aluminum, but a manufacturer of machinery, and was left with the material on hand as a result of failure to place an anticipated munitions contract. The defendant was a regular dealer in aluminum. The order of the defendant, prepared by it, described the material as "rod aluminum," "to be drawn to our specifications." By direction of the defendant the plaintiff sent the rod to the mill to be redrawn according to specifications to be furnished by the defendant. The defendant then requested that two sample coils of 5/32nds inch wire be drawn and sent to it for examination. The plaintiff advised the defendant that the manufacturer was of opinion that the rods were too hard to furnish a satisfactory 5/32nds inch wire. Under the request, two coils of wire were drawn and sent to the defendant. The defendant refused to give further specifications or to accept the wire at the mill, on the ground that the rod aluminum offered by the plaintiff was not of the character purchased by the defendant. The action is brought under the first count to recover damages for the refusal of the defendant to take the wire. The defendant claims that it bought pure aluminum and counterclaims for damages because of plaintiff's failure to furnish such aluminum as defendant claims it bought. There is a second count to recover for the two coils of 5/32nds inch wire never returned or paid for, and for 1,490 pounds shipped, out of the lot described in the order, to the defendant and never returned or paid for.

The case primarily turns upon the meaning of the terms of the written contract which the parties confessedly made. It appears that the trade designation of the rods the plaintiff had was 15 S. or 15 S. H.   15 S.

is a grade of alloyed aluminum containing about 86½ per cent pure aluminum. H is the symbol for annealed hard. O is a symbol for annealed soft. 2 S. is the symbol for commercially pure aluminum, that is, 98 to 99 per cent aluminum. Narrowly, the question was whether rod of the particular alloy, 15 S. in the trade, answered to the description and filled the order for "rod aluminum." The jury found in the affirmative, or, for reasons stated later, found an acceptance, and rendered a verdict for the plaintiff on both counts. A motion to set aside the verdict, or reduce it by deducting the damages assessed under the first count, was denied. The defendant appeals from the denial of this motion, also for claimed errors in the charge and in rulings on evidence.

Upon the charge as given the jury were fully warranted in rendering a verdict for the plaintiff. It appears from the pleadings that the negotiations were entirely in writing. The series of exhibits, concluding with the direction by the defendant of February 22d to ship the rod to the mill for redrawing, referred without exception to the material as "rod aluminum." It was also part of the order that the aluminum should be drawn to specifications. The pleadings and the finding show beyond question that the contract was for the purchase of specific property then in the hands, or subject to the order, of the plaintiff, uniformly described as rod aluminum. If, in accordance with the meaning of the term in trade, the aluminum in question was rod aluminum, the contract was met by the plaintiff. Much testimony by witnesses skilled in the business was heard by the jury as to whether "rod aluminum," either standing alone in the order, or with the additional words "to be drawn to our specifications," without further description, had a definite, established meaning in the trade; and if so, whether the meaning was pure

aluminum or a standard alloy; or, to put it more definitely, whether the alloy 15 S., containing 86½ per cent of aluminum, furnished or offered by the plaintiff, filled in the trade the requirements of a contract for rod aluminum.

It further appears that out of the entire amount covered by the defendant's order, 1,490 pounds of one-half inch rod, needing no redrawing, was shipped to the defendant upon its order and by it sold in the original package. The defendant claimed that this was sold under the belief that it was pure aluminum, and that two months later its purchaser made a claim based upon the fact that these rods were not pure but were only 93 per cent aluminum. There was evidence from which the jury might have found that no complaint was ever made about this rod and that it was accepted by the defendant as part of the entire purchase.

The jury were further entitled to consider from the negotiations, whether the order was not for the specific rods that the plaintiff had, and that if the rods delivered or offered were those and only those the plaintiff had on hand when the defendant made its first inquiry, and were in fact rod aluminum as understood in the trade, then the plaintiff filled its contract whatever the specific alloy might be. There was no error in denying the motion to set aside the verdict or reduce the amount.

The record shows about thirty exceptions to the charge, in quantity about half of rather a long charge. A number of these exceptions were, however, either withdrawn or not pursued upon the argument.

The ninth and tenth reasons of appeal relate to the preliminary part of the charge, in which the court states the making of a contract with reference to aluminum rods. There was no error here. The court is simply stating the agreed substance of the pleadings and the substance of the defendant's order as written

and accepted, and as to which there was really no controversy. The question that developed did not arise from the form of the contract or its language, as to which there neither was nor could be any dispute, and as to which there was no claim of mistake or fraud. The real question on this part of the case was what, in the trade, under the circumstances, the descriptive language "rod aluminum" and "to be drawn to our specifications," meant. The defendant contended that rod aluminum, the term uniformly used until long after the contract was closed, meant pure aluminum rod. This whole question was left wide open to the jury by the charge, and indeed was the fundamental question, and there was no error as to this part of the charge.

The eleventh, twelfth, thirty-seventh and thirty-eighth reasons of appeal relate to those portions of the charge which refer to the Philadelphia order, so-called. The court said: "Let me remind you . . . that the so-called order number 1414, commonly spoken of as the Philadelphia order, has nothing to do with the case you are to decide, and all this evidence regarding it has been offered because so much of the correspondence refers to both these orders and it has not been possible to keep them entirely distinct and therefore to keep the completed order out of the case." It appears from the finding that part of the plaintiff's aluminum consisted of 4,400 pounds of aluminum to be specified, in the original boxes as received at the mill and not described as rod. This lot was pure aluminum bought by the defendant by order 1414, February 15th, 1916, shipped by the plaintiff and paid for by the defendant, and no question is raised under this order except as explaining the references in letters. It was a separate and distinct transaction bearing no relation to the contract in question (1438), other than that it related to a specific part of the material the plaintiff had on hand as

described in his original telegram. The trial judge, apparently lest he should have been too absolute in his statement, at the very end of the charge, used the language objected to by the defendant in reasons thirty-seven and thirty-eight of its appeal by rather vaguely telling the jury in substance that it was for them to say what effect the fact that the Philadelphia order, filled with the 2 S. O. wire at the same price as for the rod aluminum, should have. As to this latter part, whether right or wrong, the defendant cannot complain, especially in view of the fact, as shown in one of defendant's letters, that the price-fixing of the order 1438 was later than and quite distinct from that in 1414, and that defendant endeavored unsuccessfully to obtain a second order at a lower price than the first.

The defendant summarizes its thirteenth and fourteenth reasons of appeal as that portion of the charge which instructed the jury to consider only the documentary evidence ending with Exhibits Q and R under date of February 22d, 1916, in determining what the contract was which the parties entered into. What the court did say was: "It seems to me, gentlemen, from an examination of these exhibits, that the contract, whatever it was, was completed between the parties by the sending of these letters Q and R of the 22d of February." An inspection of the exhibits in connection with defendant's allegations in its second defense, that "negotiations were conducted between the plaintiff and the defendant by correspondence under the signatures of the plaintiff and defendant, . . . which resulted in an agreement evidenced by such correspondence," is a sufficient justification for the instruction of the court and the charge that the contract was completed on February 22d, 1916. The court carefully refrained from saying that the interpretation of the contract was to be so limited. The court goes on

to say: "The main controversy between the parties is whether the aluminum rod which was bought and sold . . . was in fact aluminum rod within the meaning of the contract as actually made by the parties."

The defendant also criticises that part of the charge referred to in its thirteenth assignment of error, which discusses a certain letter, Exhibit D, stating in detail the aluminum rod that the plaintiff had on hand, claimed to have been sent by the plaintiff to the defendant March 12th, and which the defendant denied having received. The court, under quite proper instructions, only partially set out by the appellant, left it to the jury to say whether the defendant received the letter, and said the obvious thing, that if it did not receive the letter it was not bound by any statement therein.

The fifteenth reason of appeal is based on the instruction that, in connection with other matters, the jury might take into account the experience or lack of experience of the parties in the aluminum trade, in determining the meaning of the term rod aluminum in the contract. The defendant claims that this language would mislead the jury to the defendant's injury, as tending to excuse the plaintiff for its lack of knowledge if otherwise the facts should turn out to be to its disadvantage. Of course, the meaning of a written contract is not to be determined by the relative ignorance or knowledge of the parties. While the court may have referred to these matters incidentally in the enumeration in general language of all the facts before the jury, yet when no mistake or fraud is claimed, the references introduced under these circumstances, stated an improper element which may have appealed to and influenced the jury in favor of the plaintiff. The defendant was claiming that the term rod aluminum meant pure aluminum. Both parties agreed upon the use

of the expression "rod aluminum" as applied to specific goods. The court, both at the beginning and end of this part of the charge, put the real question very clearly to the jury. The court had just said that the main controversy was whether the aluminum rod bought and sold "was in fact aluminum rod within the meaning of the contract as actually made by the parties"; and later, "if they were aluminum rods within the ordinary meaning of the term, then it was the duty of the defendant to take and pay for them under the contract." Upon the facts generally no special meaning was presumed to be attached to the term other than the ordinary meaning as used in the trade, to which both parties were bound, whether ignorant or skilled. Possibly no harm resulted in view of the very clear statement of the real issue between them. Still, the relative ignorance and skill of the parties was again referred to more than once, and if the jury did seize upon this point it was undoubtedly with such an effect as to be prejudicial to the claims of the defendant.

The sixteenth reason of appeal is based on that portion of the charge relating to the effect of the words, "to be drawn to our specifications," upon the meaning of the contract. The court said: "It will be your duty to decide whether these words have any distinct, well known meaning in the trade, and whether they apply to both size and composition, or only to size; and if you find that they have a well known customary meaning as claimed by the defendant [which was that they referred to both size and composition], you will determine whether the plaintiff knew, or in the exercise of reasonable care and intelligence ought to have known, that the words were used in such special sense." And the court further referred to the conduct of the parties as tending to show their understanding of the contract.

This was all quite foreign to the real issue, with a contract in writing such as the present. Under the pleadings there was but one question: Did rod aluminum mean pure aluminum? Under the written contract it was quite immaterial whether the plaintiff knew or did not know of such special sense. The sale being of specific goods designated as rod aluminum in the written contract as completed and in the written negotiations leading up to the contract, it was the duty of the plaintiff to furnish rod aluminum as that term was ordinarily used in the trade. The instruction, to be applicable, must have involved the possibility of finding a special sense as claimed by the defendant. What the conclusion should be according to the specific sense found and the knowledge or ignorance of the plaintiff as to such sense, is not stated. If the instruction could have been harmful to the defendant, it must have been because the jury found a special sense as claimed by the defendant, and that the plaintiff, if ignorant, was not to be charged with it. No such direction was specifically given, but we think it was clearly implied in the language used, in order to render the language of any force whatever. It is to be observed that the words "to be drawn to our specifications," are not, in the contract itself, used as a description of the aluminum bought, but are a direction as to what was to be done to the aluminum by the plaintiff after it had been bought by the defendant. If the defendant under the contract received, or could have received, rod aluminum in its trade quality as such, the contract cannot be construed as requiring that it should be drawn to sizes impracticable for the rod aluminum of the market as described in the contract. From this instruction the jury could fairly have drawn the conclusion that the knowledge or ignorance of the plaintiff of this special meaning, if found, was a factor in the in-

terpretation of the contract. In view of the contract and the apparent meaning of this instruction, the court was in error in directing as it did.

The seventeenth reason of appeal relates to the instruction of the court as to the acceptance by the defendant of 1,490 pounds of half-inch rod under the count for goods sold and delivered. Upon the facts narrated in the claims of the defendant, this was not erroneous because amounting to a direction. What the court did say was: "It is undisputed in the testimony that the 1,490 pounds of one-half inch size, which was not to be redrawn, were shipped to the defendant at New Haven on February 23 or 24, 1916. It does not appear that any complaint was ever made regarding the composition of these rods nor that any offer was ever made to return them. Retention by the defendant of this rod, under the circumstances revealed by the evidence, amounted to an acceptance of that quantity,  . . . and this regardless of your decision upon any other questions in the case." This retention of possession without any claim indicating that the buyer had any fault to find with the goods, was quite sufficient to warrant this part of the charge; and were there any doubt about this, the court, shortly after, in that portion of the charge quoted in the twenty-first exception, in referring to the same matter, left it to the jury to decide whether there had been an acceptance of the 1,490 pounds; so that the most that can be claimed is, that taking the two directions together, the first is to be construed as an expression of opinion the soundness of which as a matter of fact was, after all, left to the jury to decide. Surely upon the admitted facts the defendant cannot justly complain.

In the eighteenth reason of appeal error is claimed because the court instructed the jury that they should consider the conduct of the parties after the informa-

tion given by the plaintiff to the defendant that the rods contained only 86½ per cent aluminum, which was on March 15th, 1916, about a month after the contract was made, in arriving at a conclusion as to the meaning of the actual contract made. The court said: "You should consider the conduct of the parties after this information was conveyed to the defendant, in arriving at your conclusion as to the actual contract made; was the conduct of the plaintiff consistent with its present claims, and was the conduct of the defendant thereafter such as might have been expected of one who supposed it had purchased pure aluminum and found that the person from whom it made the purchase refused to deliver pure aluminum and insisted upon furnishing an alloy instead." The conduct of the parties referred to, was set forth in the finding by incorporation of a number of exhibits, beginning with the letter of March 15th in which the plaintiff informs the defendant that the rods are standard aluminum too hard to be drawn to the sizes specified, and saying: "Therefore we give you this information as soon as we receive it. As dealers in aluminum it is natural to suppose that you would be familiar with these facts." The defendant acknowledged receipt of this letter, but said their special man in this line was absent. Thereafter the plaintiff repeatedly made demands based on its right to furnish aluminum rod of the kind described in the letter of March 15th. The defendant notified the plaintiff of the continued absence of its special man, and then on May 26th, through counsel, demanded an adjustment based on the refusal to furnish pure aluminum rod.

While it is undoubtedly true that a practical construction of an ambiguous contract shown by the acquiescence of one party in the claimed construction by the other, may be illuminative, and under some circumstances entitled to great weight (13 Corpus

Juris, pp. 546, 549), there is nothing in the present case that calls for or justifies the instruction complained of. There was no ambiguity in the contract other than the meaning of a technical trade term, and there was, subsequent to March 15th, merely persistence of each side in its own construction. As matter of fact, as appears from the finding, some eleven letters by the plaintiff were based on its claim, while on the part of the defendant two letters only deferred the matter, and a third claimed an adjustment for refusal to perform. These letters do not constitute a practical construction agreed upon by the parties; they constitute a series of self-serving declarations, the plaintiff's greatly outnumbering the defendant's, and the direction of the attention of the jury to these letters as bearing on the construction of the contract was erroneous.

The nineteenth, twentieth, twenty-first, twenty-second, twenty-fourth, and thirty-fifth reasons of appeal relate to certain portions of the charge as to the effect of the acceptance of the 1,490 pounds of rods referred to in the discussion of the seventeenth reason of appeal. The court said: "If there was such acceptance, then your verdict must be for the plaintiff for the reason which I have just stated: that is, that this was an entire contract and the acceptance by the defendant of a part of the merchandise required it to accept the balance." While this may be correct as a general statement, it does not fit the admitted facts in this case. The defendant was claiming that it bought pure aluminum which meant 98 to 99 per cent pure. It sufficiently appears that the 1,490 pounds was a single lot of rod of a given size needing no redrawing and was 93 per cent plus pure, and that the rod remaining in the plaintiff hands was about 86½ per cent pure. While the order was entire, the shipments were to be of wire drawn according to specifications. This

contemplated filling the order in lots according to sizes. The 1,490 pounds was admittedly a lot out of the entire order. In such case the law is: "Even if the contract would not ordinarily be deemed severable, the parties may by their conduct so treat it as to show that they regarded it as severable in fact. And where the delivery is to be in instalments, the fact that the buyer has accepted one instalment will not preclude him from refusing to accept a second instalment which in fact does not conform to the contract." 2 Mechem on Sales, § 1398; Elliott on Sales (Conn. Law) p. 498, note 7. The acceptance of the 1,490 pounds did not preclude the buyer from refusing to accept subsequent deliveries which in fact did not conform to the contract but were rods only 86½ per cent pure aluminum, if such rods did not conform to the description in the contract, and this the jury were nowhere clearly told. Upon the defendant's theory of the contract the instruction given was prejudicial and erroneous.

There are other criticisms of this portion of the charge, most of which would disappear were it corrected in accord with the above statement of the law. In this connection we notice the thirty-first reason of appeal with reference to acceptance of goods, where the language of the court quoted is: "There may be such a thing as an acceptance, an implied acceptance, by a long continued failure to refuse to accept." In the haste of delivery the court probably did not use precisely the language it would have used upon thought, but clearly enough what the court meant and what, with the context, the jury must have understood it to mean, was the statement of the fundamental rule, that an acceptance may be implied where the buyer after receiving the goods has retained them without objection for an unreasonable period. 2 Mechem on Sales, § 1380.

Some claim is made on the thirty-fourth reason of appeal with reference to the instructions as to damages, where the court said: "Such damage would include whatever loss the plaintiff has sustained by reason of the loss of its bargain." This language, however, should not be separated from what almost immediately follows: "damage for breach of a contract to buy goods ordinarily consists of the difference between the contract price and the market value of the goods at the time the buyer ought to have taken them." This substantially follows the Sales Act, § 64 (General Statutes, § 4730). Moreover, it appears by paragraph sixty-one of the finding, that it was agreed by the parties, and the jury were so informed, that the plaintiff would claim damages on a market value of 50 cents per pound for the rods the defendant refused to take, and that the defendant, on its counterclaim, would base its claim on the basis of $1.12½ per pound for pure aluminum which it claimed to have bought, the contract price being 80 cents per pound.

Many of the remaining reasons of appeal were withdrawn or not pressed upon the argument of the case. Others based on the charge and rulings upon evidence it is not necessary to consider, as in any event the determination of their correctness or error would not affect the result, and a further extended discussion, in view of the already somewhat lengthy opinion given, would not be likely to be of use upon a further trial.

There is error, the judgment is set aside and the cause is remanded to be proceeded with according to law.

In this opinion the other judges concurred.